**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ESTATE OF ROOSEVELT WILLIAMS, by
Cawthorne Ray Williams, Co-
Executor of the Estate of Roosevelt
Williams, deceased; CAWTHORNE
RAY WILLIAMS; DREMA WILLIAMS;
HARRIETT WILLIAMS,
<u>Plaintiffs,</u>

and

CAROLYN ANN JOHNSON, as Co-
Executor of the Estate of Roosevelt
Williams, and individually; JAMES
ANDREW HARDY, as Co-Executor of
the Estate of Roosevelt Williams,

and individually,
<u>Intervenors-Appellants,</u>

v.

P. D. CLEMENS, Sergeant; R. B.
KUENZEL, Trooper; J. C. CHAMBERS,
Trooper,
<u>Defendants-Appellees,</u>

and

DEPARTMENT OF PUBLIC SAFETY,
STATE OF WEST VIRGINIA; WEST
VIRGINIA STATE HIGHWAY PATROL,
<u>Defendants.</u>

No. 96-2425

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.

(CA-95-4-2)

Submitted: July 15, 1997

Decided: November 7, 1997

Before HALL, WILKINS, and NIEMEYER,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Joan G. Hill, Henry M. Hills, III, CRANDALL, PYLES & HAVI-
LAND, Logan, West Virginia, for Appellants. Steven P. McGowan,
Jeffrey K. Phillips, STEPTOE & JOHNSON, Charleston, West Vir-
ginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Two of three co-executors of the estate of Roosevelt Williams
appeal the district court's judgment in this action filed pursuant to 42
U.S.C. § 1983 (1994), and West Virginia state law. The action con-
cerns the fatal shooting of Williams during an encounter with state,
city, and county law enforcement officers. The district court con-
cluded that the three state troopers who remained as defendants did
not violate Williams's constitutional rights and, alternatively, are enti-
tled to qualified immunity. We affirm.

2

I

Williams, an 81-year-old disabled black male, was shot and killed by police in his home on January 3, 1993. At the time of the shooting, police were trying to take Williams into custody pursuant to a mental hygiene warrant obtained by his daughter, Carolyn Ann Johnson. On January 1, Johnson became concerned when her father refused to go to the hospital although he was not feeling well and she saw signs of vomited blood. After leaving his home, she repeatedly tried to call him, but the phone was not answered. The next day, Williams would not admit his grandson when he came to deliver food. Johnson called the police, who met her at Williams's house and tried to gain admittance. They heard a shot, and Williams called a neighbor to tell police to leave the house. The group dispersed, but Johnson soon called police to help her again. She was told to obtain a mental hygiene warrant. When Johnson and city police returned to the house with the warrant, shots were fired from within, one almost striking an officer on the porch.

By the time the state police were called to the scene, local police had been trying for hours to persuade Williams to leave his house peacefully. State troopers were dispatched in response to a report that law enforcement officers were being fired on.

After making repeated attempts to reach Williams, police obtained Johnson's permission to use tear gas. When Williams came to a doorway with a gun in his hand officers pleaded with him to lay down the weapon and come out. He failed to respond, and went back in the house. Trooper Wigal and Trooper Chambers entered the house to determine Williams's location. When they shined a flashlight on him in a back bedroom, Williams shot at Chambers. Later, Trooper Wigal shined a flashlight through a window into the bedroom, and Williams fired at him. Wigal returned fire and fled for cover. More tear gas was deployed. In an effort to monitor the effects of the gas, Wigal again shined a flashlight in the window. Williams fired two shots in Wigal's direction. The latter returned four shots, and one more shot was fired from the house, striking a tree near Wigal.

At about 3:20 a.m., officers decided to enter the building while it was still dark to check on Williams. Sergeant Clemens, Trooper

3

Chambers and Trooper Kuenzel entered the house. Chambers and Kuenzel placed themselves outside the bedroom doorway. Clemens stayed behind them, with his view of subsequent events obstructed by a wall. When the room was partly illuminated by Chem-light sticks and a flashlight, Chambers and Kuenzel saw Williams sitting on the floor, leaning against the bed. According to the troopers' depositions, Kuenzel identified himself as a police officer and instructed Williams not to move. Williams looked over his shoulder toward the door and began turning his torso; Kuenzel repeated the warning. Williams continued moving, his right hand holding a revolver with his finger on the trigger guard. Trooper Kuenzel yelled, "gun," and Chambers fired a warning shot into the ceiling. Williams ignored two more verbal warnings, and continued to rotate his body, bringing the gun toward the officers. Chambers and Kuenzel fired several times at Williams. Other officers not in the immediate area heard Kuenzel's verbal warnings before the shots. Williams died from the officers' shots.

When other officers entered the bedroom after the shooting, they observed Williams's body with a pistol in the right hand, and several rounds of ammunition in the left hand. The postmortem attributed Williams's death to three gunshot wounds that entered Williams's right back.

II

We analyze a claim that law enforcement personnel used excessive force in making an arrest under the Fourth Amendment reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Force is not excessive if it is objectively reasonable under the circumstances, without regard to the underlying intent of the officers. Id. at 397. Objective reasonableness is judged from the point of view of a reasonable officer on the scene. Id. at 396. An officer may use deadly force when he or she has probable cause to believe the suspect presents a threat of serious physical harm to the officer or others. Tennessee v. Garner, 471 U.S. 1, 11 (1985). Under Graham, the court must focus on the moment force was used, so that actions prior to that moment are irrelevant in evaluating whether the officer used reasonable force. Elliot v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996).

Here, the officers are entitled to summary judgment if they reasonably decided that deadly force was called for because there was prob-

4

able cause to believe that Williams presented a threat of serious harm to them or others. Clearly, the troopers did have reason to believe Williams posed such a threat. He had been shooting at officers off and on for hours, despite their assurances that they intended no harm, that they wanted to take him for help, and that his daughter was concerned about him. He was resisting a lawful arrest warrant. He ignored repeated warnings to drop his gun and be still. He disregarded a warning shot to the ceiling. He was turning toward the troopers with a pistol in his hand. Under these circumstances, the officers obviously and reasonably perceived a threat of serious physical harm.

III

Appellants assert that genuine issues of material fact precluded the district court's entry of summary judgment. We review the district court's grant of summary judgment based on a finding of qualified immunity de novo, as a matter of law. Jean v. Collins, 107 F.3d 1111, 1112 (4th Cir. 1997). In order to prevail on a summary judgment motion, the moving party must establish the absence of genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the moving party carries that burden, the nonmoving party may not rest on the allegations in his or her pleading. Id. at 324. The nonmoving party must produce sufficient evidence that demonstrates that a genuine issue exists for trial. Id. We view the facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Appellants assert that the affidavit a private investigator experienced in forensic ballistic reconstruction shows that a genuine issue of fact exists to preclude summary judgment--whether the officers in fact faced an immediate threat of serious harm. Keyser asserts that, in his opinion, Williams's death could not have occurred as reported by police, as the location of the gunshot wounds and the amount of blood lost are not consistent with Williams's position described by police. We agree with the district court that any possible discrepancies in the precise unfolding of events are not sufficient to create a genuine issue of material fact that would preclude summary judgment. The affidavit does not challenge the essence of the officers' statements--that Williams was holding a gun, pointing it toward

5

them, and ignoring their warnings and directions. We conclude, as did the district court, that reasonable officers, encountering Williams in a semi-lit room with a gun in his hand, after he had shot at officers several times during the night, could perceive a serious threat of physical harm.

We conclude that summary judgment was properly entered for the troopers. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

6